## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ABDUL WAKIL CYEEF-DIN, and**
**QUAN TRAN,**

   **Plaintiffs,**

 **vs.**              **Cause No. 21-CV-00133 JFR/LF**

**RIO RANCHO POLICE DEPARTMENT**
**LIEUTENANT NICHOLAS ONKEN,**
**RIO RANCHO POLICE DEPARTMENT**
**SERGEANT JAMES LA PORTE,**
**RIO RANCHO POLICE DEPARTMENT**
**OFFICERS, AARON, BROWN, AARON BRICK,**
**LANCE ROMERO, BRIAN MARTINEZ,**
**JONATHAN HICKERSON, ARION HAYES,**
**DYLAN GLENN, JASON FLEMING, AND**
**PATRICK ROBINSON,**

   **Defendants.**

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON THE BASIS OF QUALIFIED IMMUNITY

 **THIS MATTER** comes before the Court on "Defendants' Motion for Summary

Judgment on the Basis of Qualified Immunity."  Doc. 28.  Plaintiffs filed their response, to which

Defendants replied.  Docs. 39, 41.  Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the

parties have consented to me serving as the presiding judge and entering final judgment.

Docs. 13-16.

 Plaintiffs allege in their lawsuit a violation of their right to be free from unreasonable

searches and seizures when they were unlawfully detained and searched by Defendants while

pursuing work-related activities.  *See* Doc. 1-1 (Complaint).  Plaintiffs initially filed their lawsuit

in the Thirteenth Judicial District Court, County of Sandoval, State of New Mexico, which suit

was removed to federal court by the Defendants.  Doc. 1.  Defendants move for summary

judgment, and argue that the Defendants are protected by the defense of qualified immunity.

Having considered the parties' arguments and all relevant authority, the Court agrees and

GRANTS Defendants' summary judgment motion.

BACKGROUND

The Court will view all facts in the light most favorable to Plaintiffs, the non-moving

parties.  On December 13, 2017, Plaintiff Cyeef-Din was employed as a "drive test engineer" for

a T-Mobile vendor, whose duties required him to check cellular tower signal strength for indoor

and outdoor analysis.  Doc. 39 at 3.  Plaintiff first went to Hewlett Packard ("HP") to test their

signals, and then proceeded next door to the Sandoval Regional Medical Center ("SRMC")

campus.  *Id.* at 4.  There he was approached by security from SRMC, and after some discussions

security allowed Mr. Cyeef-Din to proceed with his testing.  Plaintiff then went up to the 6th floor

of the facility and tried to enter a nurses' station, *id.* at 5, presumably a ward that housed patients,

but a nurse refused his entry and alerted the on-duty security guard.  After further discussion, the

security guard decided to escort Plaintiff for the rest of the testing.  *See* Doc. 1-1 at ¶¶ 20-31.

The security guard documented Plaintiff's activities, and the next day the SRMC Director

of Security reviewed the report and became alarmed that Plaintiff appeared to have been taking

photographs of the hospital, had no T-Mobile credentials or uniform, and was found in areas of

the hospital that the public typically did not access.  Doc. 28 at 2.  The security director reported

the incident to the Rio Rancho Police Department ("RRPD"), which sent officers to SRMC to

investigate.  Doc. 1-1, ¶ 38.

Defendant Brown, a detective with the RRPD, testifies in his Affidavit that he received a

report of a suspicious person who was encountered on the hospital campus, and in his

investigation learned that the individual, Plaintiff Cyeef-Din, was listed on the federal terrorist watchlist, that he had a violent criminal past, that he was known to be armed, and that he was subject to an "FBI hold."  Doc. 28 at 3 (Plaintiffs' Undisputed Material Fact 4).  The Detective also notes in his Affidavit that the National Crime Information Center ("NCIC") notes an "FBI hold" in Plaintiff's file, which meant that "local law enforcement was required to notify the FBI if they came in contact with Cyeef-Din and detain Cyeef-Din until the FBI authorized his release."  Doc. 28-1 at ⁋ 5.

On December 15, 2017, Plaintiff Cyeef-Din and Plaintiff Tran returned to HP and SRMC to continue signal strength testing.  There they first met with HP's building manager, who informed Plaintiff that "some of the employees at [SRMC] called her to ask about Mr. Cyeef-Din's information."  Doc. 1-1 at ⁋ 42.  The building manager informed the Plaintiffs that some hospital employees were concerned that Mr. Cyeef-Din was a "terrorist."  Doc. 1-1 at ⁋ 44. Plaintiff Tran proceeded to the hospital security desk to inform SRMC what they were doing, at which time Plaintiff Tran was asked to produce his qualifications.  Doc. 1-1 at ⁋⁋ 46-48.  Unable to do so, Mr. Tran was then taken upstairs, where he was held for thirty minutes by SRMC staff before speaking with the Chief of Nursing and Defendants Onken and Hayes.  Doc. 1-1, at ⁋⁋ 50-51.  When Plaintiff Tran was leaving, he was detained a second time by Defendants, this time for an additional 10 minutes.  For his part, Plaintiff Cyeef-Din was located and detained by Defendants for three and one-half hours and released when the FBI gave its approval.  Doc. 28 at 4, ⁋⁋ 10-11; Doc. 39 at 3.  Plaintiff Cyeef-Din is currently on the federal terrorist watchlist, and that he and his companions are often treated as "known or suspected terrorists."  *See* Doc. 1-1, ⁋⁋ 14-76; Doc. 28 at 3-4; Doc. 28-2 at ⁋ 1093; Doc. 39 at 2-3.

Plaintiff disputes the Defendants' Undisputed Fact 4 ("UDF 4"), specifically objecting to Detective Brown's testimony "as to the contents of an NCIC report [are] hearsay and violative of the best evidence rule." Doc. 39 at 2. Plaintiffs claim that there "is no such thing as an 'FBI Hold', and dispute the claim that local law enforcement had to contact the FBI if they ever came into contact with Plaintiff Cyeef-Din and detain him until the FBI authorized his release, as not supported in law or fact. *Id.* Plaintiff states that the FBI Hold "does not comport with any known authority or activity of the FBI." *Id.* Finally, Plaintiff claims that Detective Brown's testimony is impeached by a bulletin issued by the RRPD, which makes no mention of the "FBI Hold."[1] *Id.*

STANDARD OF REVIEW

Summary judgment is appropriately granted when the movant shows, by the "materials in the record, including… affidavits or declarations, … admissions, interrogatory answers, or other materials," that the there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a), (c). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

---

[1] Plaintiffs do not offer any facts that confirm the non-existence of an "FBI Hold," but attach a Department of Justice audit report (partially redacted) dated June 2005 which reviewed the Terrorist Screening Center (Doc. 39-2), and a 2016 "Policy" from the Baltimore Police Department regarding "Handling Codes: Terrorist Response" (Doc. 39-3). Neither document specifically refers to an "FBI Hold." The Court is not prepared to conclude that the lack of reference to an "FBI Hold" in these two documents means that such a hold does not, in fact, exist. The Court also notes that Plaintiffs don't offer specific facts in dispute, just a denial and a claim that the information should not be considered based on the evidentiary reasons stated. It is well settled that denials of a fact do not establish a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)(a party opposing a properly-supported motion for summary judgment may not rest upon mere denials of the MSJ but must set forth specific facts showing that there is a genuine issue for trial.)

And to the extent Plaintiff objects to the Court's consideration of the *contents* of the NCIC report as hearsay or in violation of the best evidence rule, the Defendants don't appear to offer the NCIC evidence (terrorist watchlist; violent criminal history; armed) for the truth of the matter asserted, but to demonstrate the reasonableness of their actions in detaining Plaintiff at SRMC. Finally, there doesn't appear to be any dispute that Mr. Cyeef-Din is in fact listed on the federal terrorist watchlist, *see* Doc. 28 at 3-4; Doc. 28-2 at ¶ 1093; Doc. 39 at 2-3, so the Court will treat that fact as undisputed.

248 (1986).  An issue of fact is "material" if it is essential to the proper disposition of the claim.

*See id.*  The inquiry is "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Id.* at 251-52.

The moving party bears the initial burden of demonstrating the absence of a genuine issue

of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This burden may be met by

showing that there is a lack of evidence to support the nonmoving party's case.  *See id.* at 325.

Once the moving party has properly supported its motion for summary judgment, the burden

shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.

*See Anderson*, 477 U.S. at 256.  A party opposing a properly-supported motion for summary

judgment may not rest upon mere denials of the MSJ but must set forth specific facts showing

that there is a genuine issue for trial.  *Id*.  Any evidence tending to show triable issues will be

viewed in the light most favorable to the nonmoving party.  *Black Hills Aviation, Inc. v. United

States*, 4 F.3d 968, 972 (10th Cir. 1994); *also see Dorato v. Smith*, 108 F.Supp.3d 1064, 1155

(D.N.M. 2015) (even in qualified immunity context, courts should still view all facts in a light

most favorable to the nonmoving party) (citation omitted).

Here, the Defendants raise the affirmative defense of qualified immunity, so the Plaintiff

assumes the burden of showing (i) that the Defendants' actions violated Plaintiffs' constitutional

or statutory right(s); and (ii) that the right was clearly established at the time of the alleged

misconduct.  *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009); *accord Albright v.

Rodriguez,* 51 F.3d 1531, 1534-35 (10th Cir. 1995).  The court may decide which of the two

prongs of the qualified immunity analysis should be addressed first, "in light of the

circumstances of the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  *See Casey v. W. Las Vegas Indep. Sch. Dist.,* 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.' "  *Lobozzo v. Colo. Dep't of Corr.,* 429 F. App'x 707, 710 (10th Cir. 2011) (unpubl.) (*quoting Zweibon v. Mitchell*, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).  "Ordinarily this standard requires either that there is a Supreme Court or Tenth Circuit decision on point, or that the 'clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.'"  *Patel v. Hall*, 849 F.3d 970, 980 (10th Cir. 2017) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011)).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' "  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (alteration in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004).  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

If a plaintiff satisfies this two-part test, the burden shifts to the defendant to show there are no genuine issues of material fact at issue precluding summary judgment.  *Albright,* 51 F.3d

at 1535.  The traditional summary judgment standard applies.  The evidence is considered in the light most favorable to the non-moving party, *Applied Genetics Int'l v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990), including drawing all reasonable inferences from the available underlying facts.  *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) (per curiam).  Summary judgment is appropriate only if there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

ANALYSIS

     1.  Defendants' Initial Detention of Plaintiff Was Supported by Reasonable Suspicion

     Plaintiffs claim that the three and one-half hour detention of Plaintiff Cyeef-Din transformed that detention into an arrest.  Doc. 39 at 10.  Before addressing that question and whether Plaintiff's detention was unreasonably prolonged, however, the Court must determine if the Defendants' initial decision to detain the Plaintiffs was supported by the facts and justified under the law.

     Here, Plaintiffs claim that Defendants lacked reasonable suspicion when they unlawfully detained them.  Doc. 1-1.  Reasonable suspicion is a less demanding standard than probable cause,

> not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White,* 496 U.S. 325, 330 (1990).  "In order to demonstrate reasonable suspicion, a police officer must offer 'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot."  *United States v. Branch,* 537 F.3d 328, 337 (4th Cir. 2008) (quoting *Illinois v. Wardlaw,* 528 U.S. 119, 123 (2000)).

The facts in this case demonstrate that Defendants have shown sufficient reasonable suspicion that Plaintiffs were engaged in criminal activity to justify their initial detention on December 15, 2017.  Defendants were aware of information regarding Plaintiff Cyeef-Din, including that he was listed on a federal terrorist watchlist and was considered armed. Defendants also know that Plaintiff had been seen on the SRMC campus acting suspiciously, at least to the extent the security guard wrote a report of his encounter with the Plaintiff.  When Defendants learned that Plaintiff was back at SRMC, it was natural for them to promptly respond and detain Plaintiff to further investigate.  Indeed, the Court would be surprised if any reasonable law enforcement officer would not investigate, under these circumstances.

Plaintiffs complain that the information obtained by RRPD from the FBI's NCIC database is hearsay and therefore shouldn't be considered by this Court.  Doc. 39 at 11 et seq. The Court need not decide whether the NCIC report is hearsay, as the Defendants used the report and its contents to form reasonable suspicion to detain the Plaintiffs and not to establish the truth of its contents.  It is well-established that officers may rely on information furnished by other law enforcement officials to establish reasonable suspicion, and to develop probable cause for an arrest.  *See e.g. Albright v. Rodriguez*, 51 F.3d 1531, 1536 (10th Cir. 1995) (citations omitted).  In addition to finding that reasonable suspicion may be based upon information from other law enforcement officers, the Tenth Circuit has found that a "be-on-the-lookout" based upon information received from a confidential informant, and subsequently relied upon by other officers to support an investigative stop, was "sufficiently reliable" to justify an investigatory stop.  *United States v. Gonzales*, 897 F.2d 504, 507 (10th Cir. 1990).  Indeed, the informant's knowledge may be based on hearsay or even double hearsay.  *Id., citing Adams v. Williams*, 407 U.S. 143 (1972).  Furthermore, and more to the point, an NCIC "hit" has been deemed adequate

to establish probable cause for a valid arrest, and information obtained from NCIC "certainly possesses a sufficient degree of reliability and trustworthiness to qualify as corroborative evidence" of possible criminal wrongdoing. *See United States v. Hines*, 564 F.2d 925, 927 (10th Cir. 1977), citing *United States v. Smith*, 461 F.2d 246 (10th Cir. 1972); *also see Case v. Kitsap County Sheriff's Dept.,* 249 F.3d 921, 928 (2001) (citing "long line of cases" that show an NCIC hit "has been routinely accepted in establishing probable cause for a valid arrest."). Whether the NCIC report noted by Detective Brown is "hearsay" or not does not affect the Court's analysis.[2]

Accordingly, the Court concludes that, regardless of whether the NCIC information is "hearsay," reasonable suspicion existed for Defendants to detain Plaintiffs when they encountered them on hospital grounds on December 15, 2017.

2.  The Prolonged Detention of Plaintiff Cyeef-Din Violated His Fourth Amendment Right; Plaintiff Tran Suffered No Violation of His Rights

Next, the Court must determine whether the Defendants' detention of the Plaintiffs was prolonged in violation of their Fourth Amendment rights. As noted above, Plaintiff Cyeef-Din was detained by Defendants for three and one-half hours, while Plaintiff Tran was detained by Defendants for ten minutes. The Court concludes that Plaintiff Tran's ten-minute detention did not violate his Fourth Amendment right to be free from unreasonable search and seizure, since the duration of that detention was *de minimis*, it was based upon reasonable suspicion, and

---

[2] The Court notes that Defendants rely on *Ramirez v. City of Wichita*, 78 F.3d 597 (10th Cir. 1996), to argue that the NCIC report here is not hearsay. Doc. 41, at 3-4. The Court doesn't read *Ramirez* as creating a bright-line rule that all NCIC reports are not hearsay, rather that the NCIC report in that case was not hearsay as it wasn't offered for the truth of the matter asserted. 78 F.3d 597, *3. That appears to be the case here, as Defendants acted in reference to the "FBI hold" and not with regard to the averments, truthful or not, that Mr. Cyeef-Din was on a terrorist watchlist, had a violent criminal history, or was armed and dangerous. Regardless, *Ramirez* is still consistent with the Court's finding that the Defendants here used the NCIC report to establish reasonable suspicion to detain Plaintiffs; in *Ramirez*, the report was sufficient to establish probable cause to arrest, and the officers there acted reasonably (with regard to the first of two arrests) and did not violate the plaintiff's constitutional rights, which is the key takeaway from that opinion. *Id.*

limited to the investigation performed by Defendants into Tran's activities on the SRMC campus

and his association with Plaintiff Cyeef-Din.[3]  *See United States v. De La Cruz*, 703 F.3d 1193,

1196 (10th Cir. 2013)(in considering whether an investigative stop is reasonable, the court

conducts a two-step inquiry, asking first whether the detention was justified at its inception and,

second, whether the officers' actions were reasonably related in scope to the circumstances

initially justifying the detention).  The question of Plaintiff Cyeef-Din's three and one-half hour

detention is less clear-cut.

The law regarding prolonged detention has mostly developed from automobile stops, and

the general rule that emerges is that the detention of the motorist must be "reasonably related in

scope to the circumstances which justified the interference in the first place," as required under

*Terry v Ohio,* 392 U.S. 1, 20 (1968).  "Generally, an investigative detention must 'last no longer

than is necessary to effectuate the purpose of the stop.' " *United States v. Patten,* 183 F.3d 1190,

1193 (10th Cir.1999) (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)).  It must be

temporary, and its scope must be carefully tailored to its underlying justification.  *United States

v. Gutierrez–Daniez,* 131 F.3d 939, 942 (10th Cir.1997), *cert. denied,* 523 U.S. 1035 (1998);

*United States v. Wood,* 106 F.3d 942, 945 (10th Cir.1997).  Upon issuing a citation or warning

and determining the validity of the driver's license and right to operate the vehicle, the officer

usually must allow the driver to proceed without further delay.  *Patten,* 183 F.3d at 1193; *United

States v. Anderson,* 114 F.3d 1059, 1064 (10th Cir.1997).

Longer detentions either require consent of the individual, or the officer must

demonstrate an objectively reasonable and articulable suspicion that illegal activity has occurred

or is occurring.  *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir.1998).  Here, there is

---

[3] Tran was also detained by SRMC security for thirty minutes, but this detention does not factor into the Court's analysis, as Tran does not assert claims against these individuals.

no evidence that Plaintiff Cyeef-Din ever consented to his detention, so any additional detention

beyond his initial questioning must be based on a "particularized and objective basis" for

suspecting Cyeef-Din of wrongdoing.  *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981).

While the Court has already found that Defendants possessed reasonable suspicion to support

their initial detention of Plaintiff, the Court must still examine the totality of the circumstances to

determine whether the detaining officers were justified in detaining Plaintiff beyond the initial

questioning.  *United States v. Arvizu,* 534 U.S. 266, 272 (2002).

The parties fail to present, and the Court is unaware of, any precedent involving a

lengthy, hours-long detention of a terrorism suspect, based on an "FBI hold."  Cases involving

suspected terrorists are not particularly instructive, as many involve long detentions at the border

and present unique circumstances not germane here.  *See United States v. Montoya de*

*Hernandez*, 473 U.S. 531, 537-40 (1985) (explaining that "the Fourth Amendment's balance of

reasonableness is qualitatively different at the international border than in the interior" due to the

government's interest in protecting "the integrity of the border" from the entry of unwanted

persons and contraband into this country, as well as individuals' lessened privacy interests when

crossing international borders).  In 2011, the Supreme Court decided "whether a former Attorney

General enjoys immunity from suit for allegedly authorizing federal prosecutors to obtain valid

material-witness warrants for detention of terrorism suspects whom they would otherwise lack

probable cause to arrest."  *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011).  In that case, federal

officials arrested a United States citizen based on a judicially-authorized warrant, claiming that

he had what prosecutors believed to be information "crucial" to the prosecution of another

suspected terrorist.  563 U.S. at 734.  The citizen was detained for 16 days, and then placed on

supervised release for 14 months, but was never called as a witness.  *Id.*  The citizen then filed a

*Bivens*[4] action, claiming that his Fourth Amendment rights were violated when federal officials used a material-witness warrant to detain him as a suspected criminal, when the facts actually showed he was not a material witness.  *Id.* at 736.

The Court conducted a Fourth Amendment "reasonableness" inquiry and, after noting that the subjective intent of the officer is not relevant, *id.* at 737, concluded that no Fourth Amendment violation occurred and the former Attorney General was entitled to qualified immunity.  *Id.* at 741-43.  Importantly and in distinction to the instant case, *Ashcroft* involved a warrant issued by a federal judge, as opposed to police officers stopping and holding a person with no judicial involvement.  Nonetheless, and unfortunately for our purposes, *Ashcroft* does not address whether the 16-day detention period was unreasonably prolonged, so the opinion does little to advance the present inquiry.

A case perhaps more on-point, despite stemming from an automobile stop, is *United States v. Sharpe*, where the Supreme Court assessed whether a 20-minute detention of a motorist was too long in duration for Fourth Amendment purposes.  470 U.S. 675 (1985).  There, the Court examined "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly," and instructed that a court is to not second-guess the investigatory means chosen by the police.  470 U.S. at 686-87.  The Court saw no evidence that the officers were dilatory in their investigation, but noted that the delay was attributable to the evasive actions of the detained motorist or the result of a "graduate[d] … respons[e] to the demands of [the] particular situation."  *Id.* at 688 (citation omitted).  In *Sharpe*, the parameters of *Terry* directed the Court's analysis in determining whether the investigatory stop was too long, which is instructive to this Court's view of the detention of Plaintiff Cyeef-Din.

---

[4] *See Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971).  A *Bivens* claim can be brought only against federal officials in their individual capacities.  *See, e.g., Smith v. United States*, 561 F.3d 1090, 1099 (10th Cir. 2009).

A more recent case, another automobile stop, that examined the parameters of *Terry* is *Rodriguez v. United States*, 575 U.S. 348 (2015). In that case, a police officer noticed a vehicle veer slowly onto the shoulder of the highway for one or two seconds and then jerk back onto the road. The officer pulled the vehicle over, and after investigating the basis for the stop, decided to issue a warning to the driver. This process was completed in 21 to 22 minutes. 575 U.S. at 351-52. Nonetheless, the officer did not consider the driver and his passenger free to leave, but instead asked for permission to run his drug dog around the vehicle, which the driver denied. The officer then instructed the two men to exit the vehicle and remain in front of his patrol vehicle while he deployed his dog. On the second trip around the vehicle, the dog alerted, and pursuant to a search the officer located drugs inside Rodriguez's vehicle. *Id.* at 352.

The driver ultimately moved to suppress the drugs, but the district court denied the motion, finding that the "seven to eight minute[]" extension of the stop for the dog sniff was only a *de minimis* intrusion on Rodriguez's Fourth Amendment rights. The district court acknowledged that, beyond the canine alert, the officer was acting on nothing more than a hunch. *Id.* at 353. The Eighth Circuit affirmed, but the Supreme Court reversed and remanded, and analyzing the case through the lens of *Terry*, recognized that once the purpose of the traffic stop has been accomplished, the driver must be released. *Id.* at 354 (citing cases addressing the "tolerable duration of police inquiries in the traffic stop context"). The Court noted that the dog sniff is not part of the officer's "traffic mission" and constitutes an additional intrusion. Importantly, "[t]he reasonableness of a seizure, however, depends on what the police in fact do." *Id.* at 357 (citing *Knowles v. Iowa,* 525 U.S. 113, 115–117 (1998)). The Court remanded the case to the Eighth Circuit to determine whether the dog sniff was independently supported by individualized suspicion, as that matter had not been addressed by the circuit court. *Id.* at 358.

13

In a search warrant context, the Court has examined the execution of a judicially approved search warrant, and approved the hand-cuffing of an occupant who was present during the search but otherwise not suspected of the criminal activity being investigated. *Muehler v. Mena*, 544 U.S. 93 (2005). Later, the Court found that individuals present at the scene of the execution of a search warrant could be detained on reasonable suspicion, but such detention is limited to those within the immediate vicinity of the premises to be searched. *Bailey v. United States*, 568 U.S. 186, (2013). In reaching that decision, it is noteworthy that the Court remarked in dicta that it had remanded in *Muehler* for consideration of "whether the detention there— alleged to have been two or three hours—was necessary in light of all the circumstances, the fact that *so prolonged a detention* indeed might have been permitted illustrates the far-reaching authority the police have when the detention is made at the scene of the search." *Bailey*, 568 U.S. at 195 (emphasis added). And in *Michigan v. Summers*, another case involving the execution of a search warrant, the Court recognized the authority to detain occupants not only in light of the law enforcement interests at stake but also because the intrusion on personal liberty was limited. The *Summers* Court held detention of a current occupant "represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant." *Michigan v. Summers*, 452 U.S. 692, 703 (1981).

These automobile and search warrant cases demonstrate that *Terry's* stop-and-frisk rationale guides the prolonged detention analysis here; just as *Terry* balanced the interests and needs of law enforcement (in protecting the public and preventing crime) with the constitutional rights of the individual (to be free from oppressive and overzealous government), the Court's more recent cases are consistent to the extent they continue to demonstrate the need to limit the intrusion of government in people's lives. Line-drawing in these Fourth Amendment cases is

difficult and, ultimately, courts must balance the individual's right to be free from unreasonable searches and seizures with the government's interest in protecting and promoting public safety. While the contours of the Fourth Amendment may shift over time, and the outcomes of the balancing test are largely fact-dependent, the words of the Fourth Amendment control—"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…"  U.S. Const., Amend. IV.

With that understanding, the Court concludes that the three and one-hour detention of Plaintiff was unreasonably prolonged.  Defendants reasonably relied upon the information in NCIC and acted to carry out the indeterminate "FBI hold," but detaining an individual *for over three hours*, in the absence of probable cause for his arrest, is clearly not countenanced by *Terry.* "A *Terry* stop valid in its inception may become unduly intrusive on personal liberty and privacy simply by lasting too long.  That remains true even if valid law enforcement objectives account for the length of the seizure."  *Sharpe*, 470 U.S. at 693 (Marshall, J., concurring in result).

Here, an indeterminate "FBI hold" which demands an individual's detention "until the FBI authorized his release," simply for law enforcement's convenience, is not supported by *Terry* and is not justified under the facts here.  It is true that Plaintiff was found on the HP and SRMC campuses just two days after drawing the attention of security, and that Defendants had reason to view Plaintiff suspiciously and to detain him for investigation.  But Defendants make no showing of what the officers actually *did* during those three and one-half hours or why this case is different from other investigatory detentions.  There are no bright lines when police are acting in developing situations, and each case is fact-dependent, so a three and one-half hour investigative detention may be seen as reasonable in one case while a 20-minute detention may be deemed unreasonably prolonged in another.  Here, there is little to guide this Court, other than

Defendants followed a broad command to "hold him until we say it's okay to let him go."  Such sweeping and seemingly unlimited police power over the individual is not objectively reasonable, especially given the fact that the record is silent as to what law enforcement actually did during those three-plus hours.

The Court concludes, therefore, that the three and one-half hour detention of Plaintiff Cyeef-Din by Defendants violated Cyeef-Din's Fourth Amendment rights.  Plaintiff was effectively arrested during that time, was not free to leave, and Defendants have failed to establish that they acted with appropriate diligence in pursuing and carrying out any necessary investigation.  By contrast, Plaintiff Tran's 10-minute detention was *de minimis* and comports with the police investigation that prompted it, and therefore the Court concludes Tran did not suffer any violation of his Fourth Amendment right.

> 3.  <u>Despite Violating Cyeef-Din's Fourth Amendment Rights, the Defendants Are Entitled to Qualified Immunity</u>

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.  To that end, qualified immunity protects law enforcement officers from personal liability for civil damages stemming from "bad guesses in gray areas and ensures that they are liable only for transgressing bright lines."  *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (internal quotation omitted).  The Supreme Court has recognized that qualified immunity " 'provides ample support' to all but the plainly incompetent or those who knowingly violate the law," protecting officers from violations of constitutional magnitude.  *Burns v. Reed*, 500 U.S. 478, 494-95 (1991)(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Although the Court finds that the prolonged detention of Plaintiff Cyeef-Din was unlawful, the Court concludes that qualified immunity shields the Defendants from liability, as Plaintiff is unable to meet the second part of the qualified immunity test, namely, that the law was clearly established at the time the constitutional right was violated.  *See Riggins*, 572 F.3d at 1107.  Defendants initially acted with reasonable suspicion that Plaintiff was, or could have been, involved in criminal activity.  Importantly, reasonable suspicion does not require that an officer rule out the possibility of innocent conduct.  *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).  The Defendants were called to the SRMC after the security guards there encountered Plaintiffs on premises, two days after Mr. Cyeef-Din initially drew the attention of the security guards by his suspicious behavior.  By the time that RRPD was notified that Mr. Cyeef-Din was back at SRMC on December 15, 2017, Defendants had already learned that Plaintiff was listed on the federal terrorist watchlist, was reported to be armed, and had a violent criminal history.  As noted above, Defendants acted reasonably in responding to the scene and in detaining Cyeef-Din to further investigate.

Defendants then relied upon the information contained in NCIC, which explicitly directed them to hold the Plaintiff until the FBI authorized his release.  The question for the Court today is whether Defendants are shielded by qualified immunity when they detained Plaintiff for a prolonged period of time pursuant to that "FBI hold."

A qualified immunity inquiry must begin with "defining the circumstances with which the officers were confronted."  *District of Columbia v. Wesby*, ___ U.S. ___, 138 S.Ct. 577, 591 (2018).  The Court must endeavor to define the right at issue within the "specific context of the case, not as a broad general proposition."  *Id.*  A recent decision by the Tenth Circuit examined qualified immunity in the context of claimed violations of the plaintiff's First and Fourth

17

Amendment rights.  In *Frasier v. Evans*, the plaintiff was confronted by Denver Police Department officers after he filmed them using force during the arrest of an uncooperative suspect.  992 F.3d 1003, 1008 (10th Cir. 2021).  The officers followed the plaintiff to his car and demanded that he turn over the video of the arrest.  After the plaintiff denied the officers' request, an officer snatched the plaintiff's computer tablet without his consent.  The plaintiff sued, claiming a violation of his constitutional rights under the First and Fourth Amendments. *Id.* at 1008.  The district court denied the officers qualified immunity, and on appeal the Tenth Circuit reversed.  *Id.* at 1009.

For our purposes, *Frasier* is instructive as it confirms that, for an officer to violate clearly established law, "[t]he contours of [a] right [are] sufficiently clear' that *every* 'reasonable official would [have understood] that what he is doing violates that right."  992 F.3d at 1014, citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  That clarity must come from a Supreme Court or Tenth Circuit decision on point, and the precedent must have clearly established the right "in light of the specific context of the case, not as a broad general proposition."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citations omitted).  In *Frasier*, it was first determined that the district court erred by employing a subjective standard as to the officers' understanding of the law, whereas the qualified immunity test focuses on the objective reasonableness of the officer's conduct.  992 F.3d at 1015-16.  Thus, it is irrelevant if the officer actually believed that his conduct violated the Plaintiff's constitutional rights.  *Id.* at 1016.  Second, *Frasier* confirms that a plaintiff defeats qualified immunity when she can point to clearly established law, as opposed to "general constitutional rule[s] identified in the decisional law."  *Id.* at 1020 (citations omitted).  The plaintiff in *Frasier* relied on two First Amendment principles in an attempt to show that the officers' conduct violated clearly established law: (1) "the creation and dissemination of

18

information are speech within the meaning of the First Amendment," and (2) "[n]ews gathering

is an activity protected by the First Amendment." *Id.* The Tenth Circuit rejected plaintiff's

reliance on general principles, as they fail to establish a First Amendment right "applicable to

these circumstances." *Id.* at 1021. Even if the officers knew that plaintiff possessed First

Amendment rights to record them, the Tenth Circuit found the law was not clearly established at

the time of the incident, and thus the officers' conduct was shielded by qualified immunity. *Id.*

at 1023.

Plaintiff has not alerted the Court to any prior decision from the Supreme Court or the

Tenth Circuit that established his right to be free from prolonged detention based on an FBI hold

because his name appears on the terrorist watchlist.[5] Here, the Court is unable to say that

---

[5] Plaintiffs rely on *Galarza v. Scalczyk*, 745 F.3d 634 (3rd Cir. 2014); *Davila v. Northern Regional Joint Police Board*, 370 F.Supp.3d 498 (2019); *Arizona v. United States*, 567 U.S. 387 (2012); and *Creedle v. Miami-Dade County*, 349 F.Supp.3d 1276 (S.D.Fla. 2018).

*Arizona v. United States* addressed the interplay between state and federal law enforcement in the immigration context, with the Supreme Court determining that the state law that allowed local police officers to perform a warrantless arrest of a person believed to have committed any public offense that made her removable from the United States was pre-empted by federal law. *Arizona*, 567 U.S. 387, 407 (2012). The Court determined that, with a comprehensive federal immigration enforcement scheme in place, the Arizona law was preempted. *Id.* at 410. However, *Arizona* does not prevent state or local agencies from cooperating with the federal authorities. *Id.*

For its part, *Galarza* involved a local law enforcement agency executing a federal immigration detainer, with the Third Circuit finding that the immigration detainers issued by ICE were requests and not mandatory. 745 F.3d at 645 ("we conclude that 8 C.F.R. § 287.7 does not compel state of local LEAs to detain suspected aliens subject to removal pending release to immigration officials.") The circuit court relied in part on the Tenth Amendment's anti-commandeering principle, which compelled the finding that federal authorities can't force the states and their law enforcement personnel to act on its behalf. 745 F.3d at 644. But that's far from saying that local law enforcement may *never* cooperate with their federal counterpart(s). And while the immigration-enforcement rule of *Galarza* may be considered "clearly established" in the Third Circuit, the undersigned fails to see how *Galarza* applies to the case at hand, as *Galarza* involved an immigration detainer, which itself is established by federal regulation, whereas here we have an FBI "request to hold pending approval for release" placed on an individual who has a violent criminal history, who is known to be armed, and who has been included on the federal terrorist watchlist.

In *Creedle*, plaintiff filed suit against the U.S. Department of Homeland Security (DHS), U.S. Immigrations and Customs Enforcement (ICE), Miami-Dade County and an immigration officer claiming violations of his Fourth and Fourteenth Amendment rights, based on the fact that, despite being a U.S. Citizen, he was arrested and detained on an immigration detainer. 349 F.Supp.3d at 1283. The plaintiff posted bond after his arrest and told the jail that he was a U.S. citizen, but the jail refused to release him. Ultimately, plaintiff spent from March 12-14, 2017 in county detention. *Id.* For our purposes here, *Creedle* cites to "[n]umerous courts [that] have determined that when local law enforcement agencies hold someone pursuant to a detainer—and without separate probable cause that the person has committed a crime—such detention gives rise to a Fourth Amendment claim against the local law enforcement." *Id.*

Defendants would necessarily conclude that, on December 15, 2017, the FBI's indeterminate "hold" was obviously unconstitutional.  Stated another way, it's not clear to the Court that a reasonable government officer in the Defendants' shoes would understand that the three and one-half hour detention would violate Plaintiff's clearly established Fourth Amendment rights.  *See Casey v. W. Las Vegas Indep. Sch. Dist.,* 473 F.3d 1323, 1327 (10th Cir. 2007) (citations omitted).  The Court recognizes that its qualified immunity analysis is "not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law."  *Reavis v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020).  But still, in this Court's view, there is no "obvious clarity" that the conduct here offended a clearly established right

The Tenth Circuit has recently held that, even without a prior precedent clearly establishing the law, if the conduct in question is obviously egregious so as to clearly violate the

---

at 1304.  Yet, each of the cases relied upon in *Creedle* involved immigration detainers, and none is from the Tenth Circuit.  *See id*. at 1304-06 (citations omitted).  So, while the law may be clear—arguably—that probable cause is required before an individual can be detained on an immigration detainer, this does little to show that such was the rule on December 15, 2017, regarding an FBI hold of a terrorism suspect in the Tenth Circuit.

Finally, in *Davila*, the district court in the Western District of Pennsylvania recently examined a § 1983 claim, this time involving an Hispanic motorist alleging violations of his Fourth and Fourteenth Amendments for a prolonged roadside detention and for the officer's failure to notify the detention center that the motorist was, in fact, legally in the United States.  The district court addressed the Defendant's qualified immunity claims, and pertinent to the instant case, confirmed that local police may not enforce federal immigration laws.  370 F.Supp.3d at 547-49.  The precedent that *Davila* represents is, like *Galarza*, not only factually distinct from the instant case, but confirms the principle that a local law enforcement agency cannot detain solely on an immigration detainer.

The Court finds these cases inapposite as they address the enforcement of federal immigration detainers by local law enforcement, and none presents facts that are materially similar to what is presented here.  Drawing an analogy with a high level of generality cannot define clearly established law.  Furthermore, as recently noted by the Tenth Circuit, "[e]ven if we assume that all four decisions… clearly stand for the proposition that there is a First Amendment right […], those decisions do not indicate that this right was clearly established law in our circuit in August 2014."  *Frasier v. Evans*, 992 F.3d at 1022.  The Court concludes that, individually or taken together, the cases cited by Plaintiff do not set forth clearly established law in the Tenth Circuit that local law enforcement cannot act on an FBI Hold to detain a potentially dangerous and armed terrorism suspect whose conduct was reasonably viewed as criminally suspicious.

individual's constitutional right, then the individual may still overcome qualified immunity.  *See e.g. Ullery v. Bradley,* 949 F.3d 1282, 1291 (10th Cir. 2020) (qualified immunity denied to officer who violated plaintiff's Eighth Amendment right by using excessive force against her in the form of sexual assault and abuse; "when a public official's conduct is so egregious even a general precedent applies with "obvious clarity," the right can be clearly established notwithstanding the absence of binding authority involving materially similar facts.").  Thus, in addition to asking whether the officer was theoretically on notice that they were acting unlawfully, the court must also ask whether the conduct at issue was "particularly egregious" so as to be clearly violative of a constitutional right.

This Court concludes that Defendants acted reasonably when they detained Plaintiff until the FBI authorized his release.  Despite the fact that the detention was unreasonably prolonged, the Defendants nevertheless are entitled to qualified immunity as their conduct was not of the type that a "reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).  A local law enforcement officer carrying out a federal agency's directive to detain an individual who was reported to be on the federal terrorist watchlist and to be violent, armed and dangerous, is not conduct that this Court can qualify as "particularly egregious."  As noted above, when determining whether the right was 'clearly established,' the Court assesses the objective legal reasonableness of the police conduct and asks whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).  Here, the Court is unaware of any "existing precedent [that has] placed the statutory or constitutional question beyond debate." *Ashcroft,* 563 U.S. at 741.  Accordingly, qualified immunity shields the Defendants' conduct.

Therefore, even when the facts presented are viewed in the light most favorable to Plaintiff, they would not permit a reasonable jury to conclude that the Defendants violated Plaintiff's Fourth Amendment rights that were clearly established at the time of the alleged violation.  As such, summary judgment on the basis of qualified immunity is warranted.  The Court GRANTS Defendants' motion for summary judgment.

JOHN F. ROBBENHAAR
U.S. Magistrate Judge
Presiding by Consent